## ALFRED T. OLSON AND OTHERS v. JOHN NELSON AND OTHERS.[1]

May 3, 1929.

No. 27,117.

Johnston & Carman, for appellants.
Henry N. Jenson, for respondents.

Holt, J.

Action against directors of an insolvent bank for inducing plaintiffs to make a deposit. After verdict for plaintiffs, defendants

[1]Reported in 225 N. W. 276.

appeal from the order denying their motion in the alternative for judgment or a new trial.

The Becker County State Bank at Lake Park, Minnesota, closed July 6, 1926, and is being liquidated. At that time and for some years prior thereto defendants Nelson and Grafslund were directors of the bank and defendant Norby cashier. Plaintiffs had been and were customers of the bank and, on June 25, 1926, held certificates of deposit issued by it for $8,000 which they surrendered and received in exchange cashier's checks for the same amount. On the same day plaintiffs negotiated these checks to the State Bank of Audubon, in Becker county, receiving $1,000 in cash and $7,000 in certificates of deposit of that bank. The Audubon bank transmitted the cashier's checks, unconditionally indorsed by plaintiffs as payees, to the Becker county bank for collection, but they were not paid. Return should have been made in the regular course of business on the 27th of June, but nothing was heard from the collection until June 30 when an attorney representing the Becker county bank came to the Audubon bank to see if payment could not be delayed for a short time. He was informed that that could not be done. Thereupon Mr. Netland, the cashier of the Audubon bank, and the attorney went to the home of one of the plaintiffs and arranged for a meeting at the Becker county bank that afternoon. It was had. The cause of action is based upon the alleged fraudulent representations made by defendants at that time. The result of the conference was that the $1,000 cash and the certificates of deposit issued by the Audubon bank to plaintiffs were returned to that bank, the Becker county bank got back its cashier's checks negotiated at the Audubon bank, and in lieu thereof the Becker county bank issued certificates of deposits, due in six months, for $8,000 to plaintiffs.

Among the many assignments of error is this: the verdict is not justified by the evidence and is contrary to law. There was a verdict for $5,000. As to the damages the court charged:

"The measure of damages in this case, if you reach that question, is the difference in value between what the plaintiffs parted with and what they received in place thereof. They had two cashier's

checks after the Audubon transaction was canceled, and they received for them three new certificates of deposit, due six months after June 30, 1926. From all of the evidence you will carefully find, if you can, the value of the old cashier's checks; and if they were worth more than the new certificates of deposit, the difference will constitute the damages."

Right or wrong, the sufficiency of the evidence to support the verdict must be tested by this instruction. The Audubon bank transaction was not permitted to affect the damages. The Becker county bank lasted only a week after the alleged fraud induced plaintiffs to exchange its cashier's checks for its six months' certificates of deposit. It is impossible from this record to find any basis for such a shrinkage of the assets of the bank in those few days as is reflected in this verdict. There is no testimony tending to prove that the officers of the bank or defendants would or could have paid the old cashier's checks in money or by turning over assets it possessed or that plaintiffs were then willing to be paid in anything but cash. No one testified that the certificates of deposit were worth a penny less than the cashier's checks. We therefore conclude the verdict as to amount is unsupported and contrary to the law as given.

Defendants contend for judgment non obstante. The court submitted four alleged false representations:

"First, that the bank was safe but was temporarily unable, on account of the lack of cash, to pay the cashier's checks; second, that if the $8,000 were left in the bank for six months, or until they could reorganize, the claim would be taken care of; third, that they would reorganize the bank and put it on a safe basis; fourth, that they would not pay any outstanding certificates ahead of the plaintiffs' claim."

We do not think the evidence sufficient to justify the submission to the jury of deceit or misrepresentation except the first and so much of the second as relates to the safety of the deposit if left for six months. While there were representations in respect to reor-

ganization, there is no evidence that defendants did not do everything within their power to bring it about. Nor is there any definite testimony that any outstanding certificates of deposit were paid during the six days the bank remained open after the representations were made; except renewals and those taken in payment upon land contracts previously entered. The proposition of defendants is that plaintiffs knew and were informed that the bank was insolvent and would have to close its doors if they insisted on payment; hence they had no right to rely on the alleged fraudulent representations that the bank was safe and that they could safely accept the certificates of deposit in lieu of what they had in virtue of the negotiation of the cashier's checks.

Plaintiffs were farmers. They were ignorant of the technical legal meaning of insolvency as applied to banks. A jury from the evidence plaintiffs adduced might properly conclude that, although the bank did not have such a large sum as $8,000 then available, plaintiffs were assured it had abundant assets so that if time were extended not only that sum but other demands held by them against the bank would be safe.

The plaintiff Alfred T. Olson testified that he was told by defendants' spokesman: "We can't pay any more cashier's checks. We are short of funds. The farmers are pulling out money faster than we can haul it in, so we have to quit paying cashier's checks. I want you people to have confidence in this bank and to buy stock." Plaintiff asked then why the bank could not pay him and the response was: "The money is tied up in land and one thing and another, they had mortgages but they didn't have money." He also testified: "They let me understand the bank was all right but they didn't have money." And they said: "We have mortgages, but it is hard to collect so we want time. We want an extension of time." Plaintiff Alfred T. Olson asked defendant Norby: "Am I the only man that can close this bank?" The answer was: "Yes, $8,000 is a lot of money." There was other similar testimony reassuring to plaintiffs and inviting their confidence in the bank.

Accepting plaintiffs' testimony, the jury could well find that defendants represented that the bank was solvent and safe, when it

was not, for the purpose of inducing them to accept time certificates of deposit in lieu of what they had. That plaintiffs relied on the representations is evidenced by the fact that they had another certificate of deposit in the sum of $2,000 past due, which they allowed to stand, and a deposit account of $1,200, no part of which they sought to withdraw but on the contrary at that time increased. The jury could have accepted the testimony adduced by defendants and found no misrepresentations or fraud. However we think the evidence was such that the issue above referred to should properly be left to a jury.

As above indicated, we see no basis for any substantial damages if the transaction with the Audubon bank does not enter in. But it may well be claimed that plaintiffs had sold or negotiated the cashier's checks to the Audubon bank and had the cash and its equivalent in hand which was lost by defendants' fraud. It is true they had indorsed the checks, which had been dishonored. But no legal notice of dishonor had been given to plaintiffs by the Audubon bank. In that situation were plaintiffs liable on their indorsement to the Audubon bank? If not, they were induced by defendants' misrepresentations to give up $1,000 in cash and certificates of deposits worth $7,000 for the time certificates of deposit of the insolvent Becker county bank. It does not appear that all questions of law or fact pertaining to this phase of the case were litigated in the court below, and certainly the court's charge eliminated its consideration from affecting the damages. In that situation we deem it best to leave the matter open to be presented at another trial.

Other questions presented by the assignments of error are not likely to become important.

The order is reversed to the extent that a new trial is granted.

HILTON, J. (concurring).

I concur in the reversal and the granting of a new trial.

STONE, J. (dissenting).

I cannot agree that the evidence justifies either the conclusion that false representations were made by defendants or that the latter's statements, true or false, were relied upon by plaintiffs.

It is certainly fair enough to plaintiffs to interpret the representations made by defendants as plaintiffs interpreted them when they were made. Mr. Alfred T. Olson, one of the plaintiffs, represented all of them at the conference. He was told frankly that the bank could not " 'pay  *  *  *  if we can't get together and fix it up some way  *  *  *  we will have to close the bank.'  *  *  *  'There is no more funds, and we have to stop payment of checks. We can't ship in money  *  *  *  as fast as the farmers are pulling it out.'  *  *  *  He [defendant Nelson] wanted me to have confidence in the bank and wanted everybody else to have confidence in the bank to reorganize. The main subject was to sell some stock  *  *  *  and keep it [the bank] going." The plaintiffs were asked to leave their "money for six months so they [the bank] could have a chance to go on and do business." They were informed that the bank's money was " 'tied up in land and one thing and another, they had mortgages but they didn't have money.' "

, No one of these representations nor all of them together meant solvency or safety. They indicated the contrary. Alfred T. Olson rather emphasizes that he "commenced to get kind of leery  *  *  *  wondered what was up" and was "suspicious." The determination that there was false representation hangs solely upon his testimony that "they let me understand the bank was all right but they didn't have money." My own idea is that such a statement of the mere conclusion of a witness, in such a setting as it here occupies, showing that the controlling facts were truthfully given him, is altogether too scant and questionable a basis upon which to put a conclusion of fraud.

There remains the question whether, assuming false representations, they were relied upon by plaintiffs. Alfred T. Olson says very distinctly that he did not rely upon them. In two of the directors, Nelson and Nanstead, Olson had particular confidence. He insisted that they be called in. After Mr. Norby explained that they were " 'working every day, trying to reorganize'." and asked Mr. Olson to leave "the money for six months so they could have a chance to go on and do business," he told them, so he testifies, "if

they agreed to take care of me, I would leave the money six months * * * I called them [Nelson and Nanstead] in for that purpose, because I wanted to be taken care of. I had my money and I wanted to be taken care of." He "asked them if they would agree to take care of me, and they answered unanimously 'Yes,' at least two of them did. * * * As soon as they said unanimous 'Yes,' I threw the money on the table. Since they agreed to that, I was through."

If that does not indicate that Mr. Olson relied, not on any representations, true or false, but rather and only on the promissory and what may have seemed the contractual undertaking of the directors, I am wrong. But if the testimony referred to, and there is none other, does show reliance upon promise rather than mere representation, there was no cause of action for deceit and judgment should have been directed for defendants.